**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:16-CR-212** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **DEVIN DICKERSON,** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM**

Defendant Devin Dickerson moves the court to suppress statements made during his post-arrest interview on August 4, 2016.[1]  We will deny the motion.

**I.    Factual Background and Procedural History**

The criminal investigation and charges in this case originate with a triple homicide and robbery on June 25, 2016.  The third superseding indictment identifies the homicide victims as Wendy Chaney,[2] Phillip Jackson, and Brandon Cole.  The murders and robbery occurred in a barn on Jackson's farm, located at 11026 Welsh Run Road in Mercersburg, Franklin County, Pennsylvania.  The alleged events leading up to the triple homicide and robbery have been detailed in the court's prior opinions in this case and are incorporated herein by reference.

---

[1] Dickerson also moves the court to suppress evidence seized from a vehicle on July 7, 2016.  We will address that motion in a separate memorandum following a second evidentiary hearing.

[2] The third superseding indictment uses two different spellings for this victim's last name, switching between "Chaney" and "Cheney."  We use "Chaney" in this memorandum, which we understand to be the correct spelling.

Relevant here, on August 3, 2016, a federal grand jury returned a five-count indictment charging Dickerson and codefendant Kevin Coles with drug-trafficking and firearms offenses.  The charges arose from Dickerson and Coles' alleged drug-trafficking activities in Franklin County in the late spring and early summer of 2016.  A warrant was issued for Dickerson's arrest, and several law enforcement agencies, including the Drug Enforcement Administration ("DEA") and the Pennsylvania State Police ("PSP"), coordinated to effectuate Dickerson's arrest.

Law enforcement located Dickerson at a park in Hagerstown, Maryland, on August 4, 2016, using court-authorized GPS ping monitoring of Dickerson's cell phone.  (See 7/22/21 Tr. 10:7-11:7).  DEA Special Agent Keith Kierzkowski ("SA Kierzkowski") and PSP Trooper Antwjuan Cox identified Dickerson among a large crowd of people watching a Pee Wee football game.  (See id. at 10:21-11:7).[3]  Based on Dickerson's criminal history, his reputation for carrying firearms, and his status as a suspect in the triple homicide investigation, the officers elected to wait to arrest him until the crowd dispersed.  (See id. at 11:8-17, 37:2-16).  When the crowd had thinned, SA Kierzkowski approached then advised Dickerson that he was under arrest for a federal indictment in the United States District Court for the Middle District of Pennsylvania.  (See id. at 21:15-18, 22:9-13).  Arresting officers obliged Dickerson's request to allow him to finish his cigarette before placing him in

---

[3] SA Kierzkowski and Trooper Cox detailed the circumstances of Dickerson's arrest and his subsequent interview during an evidentiary hearing on July 22, 2021. The court finds the testimony of both officers to be highly credible.  The findings of fact set forth herein reflect the court's credibility finding.

handcuffs and transporting him to the DEA office in Hagerstown.  (See id. at 11:23-12:7, 37:19-38:9).

Dickerson was placed in a holding cell while officers prepared audio and video recording equipment in the interview room.  (See id. at 12:8-13, 38:16-24).  Once in the room, SA Kierzkowski presented Dickerson with the DEA-13 form outlining the Miranda rights.  (See id. at 9:12-18, 12:17-13:14, 39:2-23).  That form reads, in pertinent part:

**YOUR RIGHTS**
BEFORE WE ASK YOU ANY QUESTIONS, DO YOU UNDERSTAND:

- ☐  You have the right to remain silent.

- ☐  Anything you say can be used against you in court.

- ☐  You have the right to talk to a lawyer for advice before we ask you any questions.

- ☐  You have the right to have a lawyer with you during the questioning.

- ☐  If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

Do you understand your rights?

Are you willing to answer some questions?

(Gov't Hr'g Ex. 1).  The form also includes check boxes to acknowledge that the rights were read, signature lines for the interviewee and two witnesses, and spaces for filling in the location, date, and time.  (See id.)

SA Kierzkowski read Dickerson his Miranda rights "verbatim" from the DEA-13 form.  (See 7/22/21 Tr. 12:17-18; see also id. at 39:18-23).  When asked if he understood his rights, Dickerson "nodded yes," but he refused to sign the DEA-13

form, stating, "I'll talk to you . . . but I'm not signing that . . . form." (See id. at 13:3-19, 39:3-40:6). SA Kierzkowski told Dickerson that he would like to audio or video record the interview, "to make sure that we get everything accurate of your statement." (See id. at 14:1-3; see also id. at 40:7-10). Dickerson replied, "I'll talk to you, but I'm not going to be recorded." (See id. at 14:3-4; see also id. at 40:7-13). SA Kierzkowski presented Dickerson with the DEA-269 form for recording declination, (see id. at 14:4-5, 40:9-10; see also Gov't Hr'g Ex. 2), and Dickerson refused to sign that form too, stating, "I'm not signing anything, but I'll talk to you," (see 7/22/21 Tr. 14:5-6; see also id. at 40:14-20).

Dickerson started talking immediately after these preliminaries, before either officer asked a substantive question. According to SA Kierzkowski, Dickerson first asked the officers how they found him. (See id. at 14:14-15, 34:19-35:6; see also id. at 40:21-41:6, 41:10-12). Dickerson then stated he knew he was a suspect in the triple homicide before attempting—without inquiry from either officer—to establish an alibi. (See id. at 14:20-15:6, 33:2-8, 34:19-35:6; Gov't Hr'g Ex. 3 at 1). Specifically, Dickerson volunteered that he did not know anything about the triple homicide and that he was at Nick's Airport Inn in Hagerstown on the night of June 25, 2016. (See 7/22/21 Tr. 14:20-15:6, 33:2-8, 34:19-35:6; Gov't Hr'g Ex. 3 at 1). When asked if anyone could corroborate his claimed whereabouts, Dickerson relayed that he had spoken to a young man who was going into the military and that officers should look for that man. (See 7/22/21 Tr. 14:25-15:3; see also Gov't Hr'g Ex. 3 at 1). He also suggested investigators should check the cell towers from the area of the triple homicide and stated they would not find his phone number in the tower records.

(See 7/22/21 Tr. 15:3-6; see also Gov't Hr'g Ex. 3 at 2).  SA Kierzkowski testified that officers "were surprised about how he even knew about tower hits at the murder scene." (7/22/21 Tr. 15:5-6).

SA Kierzkowski confronted Dickerson about his alibi, telling Dickerson that authorities had direct knowledge putting Dickerson and Coles together after midnight on the night of the murders.  (See 7/22/21 Tr. 16:1-3; see also Gov't Hr'g Ex. 3 at 2).  Dickerson quickly "became very agitated and screamed, 'I was not there when he did *that*!'" (See 7/22/21 Tr. 16:4-5 (emphasis in testimony); see also Gov't Hr'g Ex. 3 at 2).  SA Kierzkowski testified that, after Dickerson realized what he had said, he slammed his hand on the table.  (See 7/22/21 Tr. 16:5-6; see also Gov't Hr'g Ex. 3 at 2).  When the officers tried to clarify what Dickerson meant by "that," he accused them of "trying to put words in his mouth."  (See Gov't Hr'g Ex. 3 at 2; see also 7/22/21 Tr. 16:6-8).

Dickerson told SA Kierzkowski and Trooper Cox that he had read about the murders in a newspaper, that he knew Chaney had been Coles' girlfriend, and that he and Coles were together daily but had not discussed her murder.  (See 7/22/21 Tr. 14:21-25; see also Gov't Hr'g Ex. 3 at 2).  SA Kierzkowski and Trooper Cox described Dickerson's demeanor as "nonchalant," "[e]xtremely laid back," "mild mannered," "calm and cool," and "pretty much calm . . . and . . . collected" during the interview.  (See 7/22/21 Tr. 15:19-22, 15:25-16:1, 17:8-10, 42:5-7).  SA Kierzkowski added that Dickerson claimed that Wendy's death did not affect him, that it had nothing to do with him, and that he was not worried about it.  (See id. at 15:19-22, 28:10-14).  Before ending the interview, the officers also asked Dickerson

about the ongoing drug case.  (See id. at 15:7-19, 16:10-25; see also Gov't Hr'g Ex. 3 at 2-3).  SA Kierzkowski testified to his impression that Dickerson "wanted to take the drug case on the chin, but he didn't want to talk [about], or take the rap [for], the murders.  He didn't want to involve himself with the murders."  (See 7/22/21 Tr. 28:6-9; see also Gov't Hr'g Ex. 3 at 3).  Both officers testified that Dickerson did not appear to be under the influence of alcohol or drugs at any point during the interview, and that he appeared to fully understand all questions asked.  (See 7/22/21 Tr. 17:11-23, 42:2-16).

The grand jury has returned three superseding indictments, adding new defendants and capital charges along the way.  The case is now proceeding on a third superseding indictment, which charges Dickerson as follows:

- Count One: conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) and Pinkerton v. United States, 328 U.S. 640 (1946);

- Count Two: Hobbs Act robbery, and aiding and abetting same, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2;

- Counts Three, Four, and Five: using, brandishing, and discharging a firearm during and in relation to a crime of violence (Hobbs Act robbery and killing a witness) resulting in the deaths of Phillip Jackson, Brandon Cole, and Wendy Chaney, respectively, and aiding and abetting same, in violation of 18 U.S.C. § 924(c) and (j) and 18 U.S.C. § 2;

- Count Six: conspiracy to use, brandish, and discharge a firearm during and in relation to a crime of violence (Hobbs Act robbery and killing a witness) resulting in the death of Chaney, in violation of 18 U.S.C. § 924(c), (j), and (o);

- Count Seven: conspiracy to commit murder for hire in violation of 18 U.S.C. § 1958 and Pinkerton;

- Counts Eight, Nine, and Ten: murder of witnesses (Chaney, Jackson, and Cole, respectively), and aiding and abetting same, in violation of 18 U.S.C. § 1512(a)(1)(C) and 18 U.S.C. § 2;

- Count Eleven: conspiracy to murder witnesses (Chaney, Jackson, and Cole) in violation of 18 U.S.C. § 1512(k);

- Count Fourteen: conspiracy to distribute and possess with intent to distribute at least 100 grams of heroin and at least 28 grams of cocaine base and cocaine hydrochloride in violation of 21 U.S.C. § 846;

- Count Sixteen: possession with intent to distribute heroin, cocaine hydrochloride, and cocaine base, and aiding and abetting same, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2;

- Count Seventeen: possession with intent to distribute heroin and cocaine base, and aiding and abetting same, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2;

- Count Eighteen: distribution of heroin resulting in serious bodily injury, and aiding and abetting same, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2; and

- Count Nineteen: possession of firearms in furtherance of a drug-trafficking crime, and aiding and abetting same, in violation of 18 U.S.C. § 924(c)(1), 18 U.S.C. § 2, and <u>Pinkerton</u>.

(<u>See</u> Doc. 499 at 8-24, 28-31, 33-36).

After the government filed its notice of election not to pursue the death penalty on June 4, 2020, we established a pretrial and trial schedule, including separate phases of pretrial motions practice. Dickerson timely filed the instant suppression motion on March 3, 2021. The motion is fully briefed and ripe for disposition.

## II.   <u>Discussion</u>

Dickerson raises two challenges to his custodial statements on August 4, 2016: he alleges, first, that he was not properly advised of his <u>Miranda</u> rights and, second, that he did not knowingly, intelligently, and voluntarily waive those rights. (<u>See</u> Doc. 816 at 2; Doc. 817 at 1-3).  The record developed during the evidentiary hearing on July 22, 2021, refutes both arguments.

In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Supreme Court of the United States held that before an individual is subjected to custodial police interrogation, they must be informed of certain rights.  These rights include the right to remain silent and the right to have counsel—either appointed or retained—present during questioning.  <u>See</u> <u>Miranda</u>, 384 U.S. at 444.  An individual must also be warned that any statement they make may be used as evidence against them.  <u>See</u> <u>id.</u>  Failure to apprise an individual of their <u>Miranda</u> rights may render any statements procured during interrogation inadmissible at trial.  <u>See</u> <u>id.</u>  No "talismanic incantation" is required to satisfy the strictures of <u>Miranda</u>.  <u>California v. Prysock</u>, 453 U.S. 355, 359 (1981) (<i>per curiam</i>).  The warning provided, however, must "reasonably convey" to individuals in custody their rights as established in <u>Miranda</u>.  <u>See</u> <u>Duckworth v. Eagan</u>, 492 U.S. 195, 203 (1989) (quoting <u>Prysock</u>, 453 U.S. at 361) (alteration omitted).

The record establishes that SA Kierzkowski properly advised Dickerson of his <u>Miranda</u> rights.  SA Kierzkowski testified that, before the interview began, he

advised Dickerson of his <u>Miranda</u> rights by reading those rights verbatim from the

DEA-13 form:

> I told him that this was a DEA-13 form, that this was his
> rights, and then I read to him from the form.  "Before we
> ask you any questions do you understand you have the
> right to remain silent; anything you say can be used against
> you in court; you have the right to talk to a lawyer for
> advice before we ask you any questions; you have a right to
> have a lawyer with you during questioning," during the
> questioning, "if you cannot afford a lawyer one will be
> appointed for you before any questioning, if you wish.  Do
> you understand your rights?"

(7/22/21 Tr. 13:3-11).  Trooper Cox, who was also present during the interview,

confirmed that SA Kierzkowski provided a full <u>Miranda</u> warning to Dickerson

before the interview began.  (<u>See</u> <u>id.</u> at 39:3-23).  As noted *supra*, we find both

officers to be highly credible, and we specifically credit this aspect of their hearing

testimony.  We will thus deny Dickerson's motion to the extent it alleges he was not

provided a <u>Miranda</u> warning before speaking with SA Kierzkowski and Trooper

Cox.

Dickerson also claims the government cannot show a valid waiver of his

<u>Miranda</u> rights.  Any waiver of <u>Miranda</u> rights must be "knowing, intelligent, and

voluntary."  <u>Maryland v. Shatzer</u>, 559 U.S. 98, 104 (2010) (citing <u>Miranda</u>, 384 U.S. at

475).  To determine if a waiver meets this standard, we must conduct a two-pronged

inquiry, asking (1) whether the purported waiver was voluntary "in the sense that it

was the product of a free and deliberate choice rather than intimidation, coercion or

deception," and (2) whether it was "made with a full awareness both of the nature

of the right being abandoned and the consequences of the decision to abandon it."  United States v. Syriuth, 98 F.3d 739, 748-49 (3d Cir. 1996) (quoting United States v. Velasquez, 885 F.2d 1076, 1084 (3d Cir. 1989)).  The government bears the burden of establishing the validity of a Miranda waiver.  See Colorado v. Connelly, 479 U.S. 157, 168 (1986) (collecting cases).

A waiver need not be explicit to be effective.  See North Carolina v. Butler, 441 U.S. 369, 375-76 (1979).  Nor is it required that a waiver be acknowledged or confirmed in writing.  See United States v. Stuckey, 441 F.2d 1104, 1105 (3d Cir. 1971).  As the Supreme Court has explained, the law presumes "that an individual who, with a full understanding of [their] rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford."  Berguis v. Thompkins, 560 U.S. 370, 385 (2010).  Thus, an individual may impliedly waive the right to remain silent by voluntarily speaking after receiving Miranda warnings.  See id. at 384 ("Where the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.")

We have little difficulty concluding that Dickerson knowingly, intelligently, and voluntarily waived his Miranda rights on August 4, 2016.  Dickerson listened to the Miranda warning, indicated that he understood his rights, and told the officers, repeatedly, that he wanted to speak with them.  SA Kierzkowski and Trooper Cox testified that they believed Dickerson understood his rights and the questions being asked, that his responses were appropriate to the questions asked, and that he did

not appear to be under the influence of drugs or alcohol.  (<u>See</u> 7/22/21 Tr. 17:11-23,

42:2-16).  That Dickerson has some experience with the criminal justice system and

invoked his <u>Miranda</u> rights during a separate encounter with authorities just one

month earlier, (<u>see</u> <u>id.</u> at 42:21-44:19, 46:9-20), confirms that he fully understands

his rights, his ability to invoke them, and the consequence of waiving them, <u>see</u>

<u>United States v. Jacobs</u>, 431 F.3d 99, 108 (3d Cir. 2005) (noting that courts should

consider suspect's "prior dealings with the criminal justice system" when assessing

validity of <u>Miranda</u> waiver).

There is also no indication in this record that Dickerson's <u>Miranda</u> waiver

was involuntary or coerced.  Quite to the contrary, it was Dickerson who initiated

conversation with SA Kierzkowski and Trooper Cox promptly after being read his

rights, before either officer had even asked a question.  (<u>See</u> 7/22/21 Tr. 14:14-15,

14:20-15:6, 40:21-41:6, 41:10-12; <u>see also</u> Gov't Hr'g Ex. 3 at 1).  Dickerson clearly

viewed this interview as a chance to establish an alibi and to exculpate himself in

the triple homicide investigation, and he knowingly, intelligently, and voluntarily

waived his <u>Miranda</u> rights to try to take advantage of that opportunity.  We

conclude that the government has met its burden of establishing that Dickerson

waived his <u>Miranda</u> rights during the August 4, 2016 interview.

III.   **<u>Conclusion</u>**

  We will deny Dickerson's motion (Doc. 816) to suppress statements made during his post-arrest interview on August 4, 2016.  An appropriate order shall issue.

       /S/ CHRISTOPHER C. CONNER
       Christopher C. Conner
       United States District Judge
       Middle District of Pennsylvania

Dated:  August 2, 2021