## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 1:16-CR-212 |
| | : | |
| v. | : | (Judge Conner) |
| | : | |
| DEVIN DICKERSON, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM

Defendant Devin Dickerson moves the court to suppress items seized from an automobile and a statement made to law enforcement on July 7, 2016. We will deny Dickerson's motion.

## I.   Factual Background and Procedural History

The criminal investigation and charges in this case originate with a triple homicide and robbery on June 25, 2016. The third superseding indictment identifies the homicide victims as Wendy Chaney,[1] Phillip Jackson, and Brandon Cole. The murders and robbery occurred in a barn on Jackson's farm, located at 11026 Welsh Run Road in Mercersburg, Franklin County, Pennsylvania. The alleged events leading up to the triple homicide and robbery have been detailed in the court's prior opinions in this case and are incorporated herein by reference.

---

[1] The third superseding indictment uses two different spellings for this victim's last name, switching between "Chaney" and "Cheney." We use "Chaney" in this memorandum, which we understand to be the correct spelling.

A.      **Triple Homicide Investigation**[2]

Pennsylvania State Police ("PSP") Corporal Paul Decker ("Corporal

Decker") is the lead investigator assigned to the triple homicide and robbery

investigation and was among the first to respond to Jackson's farm on June 25,

2016.  (See 9/3/21 Tr. 47:24-48:3, 60:1-61:5).  After arriving at the scene, Corporal

Decker first interviewed codefendant Torey White.  (See id. at 60:1-2).  White told

Corporal Decker that codefendant Kevin Coles sold drugs to Jackson and was in a

romantic and drug-trafficking relationship with Chaney.  (See id. at 60:1-9).

On the evening of June 26, 2016, Corporal Decker and others travelled to

Hagerstown, Maryland, to meet with Hagerstown detectives and members of the

Washington County Drug Task Force ("Drug Task Force") regarding the murders.

(See id. at 60:11-16).  Drug Task Force agents told Corporal Decker that they were

familiar with Chaney and Jackson, and that Chaney had been working with the

Drug Task Force as a confidential informant at the time of her death.  (See id. at

60:16-20).  Specifically, Chaney had been providing information about drug

trafficking in the Hagerstown area, and she had sent text messages to a Drug Task

Force agent reporting that two men she called "Shy" and "K" were supplying

_____

[2] The factual background that follows derives primarily from a suppression hearing held on September 3, 2021.  The parties also agreed to incorporate into the record the testimony of Hagerstown Police Sergeant Jesse Duffey offered during a July 18, 2017 evidentiary hearing on a motion to suppress filed by codefendant Kevin Coles.  The court cites to the transcripts of those hearings as "9/3/21 Tr. __" and "7/18/17 Tr. __," respectively.  The court cites to the government's September 3, 2021 hearing exhibits as "Gov't Ex. __."  The court finds the testimony of Sergeant Duffey and of Pennsylvania State Police Corporal Paul Decker to be highly credible.  To be pellucidly clear, the findings of fact set forth herein reflect the court's credibility determination.

heroin to Jackson.  (See id. at 60:20-24).  Hagerstown law enforcement officers told Corporal Decker that Dickerson was known to them as "Shy" and Coles was known to them as "K."  (See id. at 61:9-62:5).  Chaney's text messages confirmed that "K" referred to "Kevin Coles."  (See id. at 61:22-62:3).  In her text messages, Chaney had named Dickerson and Coles as drug traffickers and expressed fear "that she was compromised by them at that point, because . . . they know the vehicles that the county task force agents operate."  (See id. at 62:11-15).

Corporal Decker conducted several other interviews in the days after the triple homicide.  (See id. at 62:19-24).  One person—identified only as "a source" during the evidentiary hearing—told Corporal Decker that he had seen Dickerson and Coles at Jackson's farm "on numerous occasions . . . supplying . . . Jackson with heroin."  (See id. at 62:25-63:7).  This individual also stated he had seen Coles at Jackson's barn "with a .40 caliber handgun and an AR-15."  (See id. at 63:7-9).  Jackson's widow, Amber Jackson, spoke with Corporal Decker as well and advised that she had observed "Shy and K" at the barn about two weeks prior to the triple homicide; that they were in "a silver Chevy" she thought was a Traverse, with Maryland registration; and that they "had been shooting guns up there with her husband Phillip Jackson."  (See id. at 63:13-24).  Amber Jackson confirmed to Corporal Decker that her late husband had been a drug user.  (See id. at 64:5-8).

Corporal Decker also interviewed members of Chaney's family.  Chaney's mother spoke with Corporal Decker on June 26, 2016, and reported that Chaney had been in an abusive relationship with Coles and that she believed Coles had "recently . . . kicked . . . Chaney's apartment door in looking for her."  (See id. at

64:9-24).  Chaney's children confirmed the information provided by her mother.  All three children described a "violent relationship" and "fighting" between Chaney and Coles and expressed their belief "that he may have something to do with this, with the murder of their mother."  (See id. at 64:25-65:11).

**B.     July 7, 2016 Encounter**

By July 2016, officers had identified both Dickerson and Coles as persons of interest in the triple homicide investigation.  (See 9/3/21 Tr. 21:4-14, 24:12-16, 32:17-23; 7/18/17 Tr. 7:10-12).  Investigators became aware of an arrest warrant issued for Coles in New York state, and the Maryland State Police fugitive apprehension team began working to find and arrest Coles on that warrant.  (See 9/3/21 Tr. 9:2-16; see also 7/18/17 Tr. 10:20-12:19).  On July 7, 2016, the team tracked Coles to the area of a Days Inn in Hagerstown, Maryland, using court-authorized, real-time tracking of Coles' cell phone.  (See 9/3/21 Tr. 9:12-20; see also 7/18/17 Tr. 7:1-6).

The fugitive apprehension team coordinated with Hagerstown police officers, including Sergeant Jesse Duffey ("Sergeant Duffey"), to arrest Coles.  (See 9/3/21 Tr. 9:21-10:4; 7/18/17 Tr. 7:7-14).  Officers positioned themselves to conduct surveillance outside of the Days Inn and initially planned to enter the hotel and make contact with Coles in his hotel room.  (See 9/3/21 Tr. 10:3-6; see also 7/18/17 Tr. 7:14-16).  At approximately 11:30 a.m., before officers could enter the hotel, they observed Coles exiting the main lobby carrying a white plastic bag to wait under the portico with two women.  (See 9/3/21 Tr. 10:6-11, 36:4-7; 7/18/17 Tr. 7:16-17, 7:22-25).  The bag was roughly the size of an 11-gallon kitchen trash bag, (see 9/3/21 Tr. 22:17-23:1), and "appeared to be pretty full of items," (see 7/18/17 Tr. 8:3-5).  Not long after

4

Coles and the two women exited the lobby, a silver Chevrolet Equinox with tinted windows and Maryland registration pulled under the portico.[3]  (See 9/3/21 Tr. 10:6-14; 7/18/17 Tr. 8:3-9).  Dickerson was driving the Equinox, and a third woman was seated in the passenger seat.  (See 9/3/21 Tr. 21:18-22:5).  Coles and his companions immediately entered the vehicle's back seat, with Coles sitting directly behind the passenger seat.  (See id. at 22:5-16).

The Equinox began to pull forward within "a matter of a few seconds" after Coles and the two women entered, at which point officers decided to stop the vehicle and arrest Coles.  (See id. at 10:15-17, 23:5-12).  The officers moved in and positioned their marked patrol cars to block the Equinox from fleeing.  (See id. at 10:18-20).  They approached the Equinox with guns drawn and ordered Coles to exit.  (See id. at 10:20-22).  They then handcuffed Coles and took him into custody.  (See id. at 10:22-11:1).  Dickerson and the three female passengers were detained while officers executed Coles' arrest.  (See id. at 10:22-23).

---

[3] Sergeant Duffey's testimony was inconsistent as to how long Coles and his companions waited for Dickerson to arrive.  During the September 2021 hearing, Sergeant Duffey testified the Equinox pulled up just "[s]econds after" the group exited the lobby.  (See 9/3/21 Tr. 10:11-14; see also id. at 22:9-12).  In his July 2017 testimony, however, Sergeant Duffey stated it was "several minutes" before the Equinox arrived.  (See 7/18/17 Tr. 8:5-8).  The discrepancy is immaterial.  And we decline to infer from it the motive Dickerson implies in his briefing.  (See Doc. 984 at 15 ("If he was in fact under the portico for several minutes, the only explanation for the police not moving in on Coles at that time, was the belief, or perhaps hope, that he would be picked up by a vehicle, and the desire to search whatever car showed up to get him.")).  Assuming arguendo it was "several minutes" and not mere seconds before the Equinox arrived, officers could have had any number of reasons—including confirming Coles' identity or ensuring the scene was secure—for not apprehending him immediately.

After arresting Coles and temporarily detaining Dickerson and the other passengers, Sergeant Duffey called Corporal Decker, whom Sergeant Duffey knew to be the lead investigator assigned to the triple homicide investigation.  (See id. at 8:23-9:1, 11:4-10; 7/18/17 Tr. 12:16-19).  Corporal Decker advised that Dickerson and Coles were persons of interest in that investigation and directed Sergeant Duffey to transport Dickerson, Coles, and the three female passengers to the Hagerstown police department for questioning by Trooper Decker and his PSP colleagues.  (See 9/3/21 Tr. 11:11-18, 32:9-23).  Trooper Decker also instructed Sergeant Duffey to tow the Equinox to the Hagerstown police department while law enforcement applied for a warrant to search the vehicle.  (See id. at 11:18-21).

Officers called for marked patrol units to transport all five individuals to the Hagerstown police station.  (See id. at 11:22-12:2).  Sergeant Duffey could not recall for certain whether Dickerson was handcuffed during transport, but assumed he was based on police department policy.  (See id. at 27:6-15).  The police station had a limited number of interview rooms, so officers placed Dickerson in an employee break room while waiting for PSP investigators.  (See id. at 13:2-8).  Dickerson was not shackled to the floor, but it is unclear whether his wrists were handcuffed during this time.  (See id. at 13:10-11, 27:8-11).

Corporal Decker, PSP Trooper Antwjuan Cox ("Trooper Cox"), PSP Trooper Jeremy Holderbaum ("Trooper Holderbaum"), and two or three other PSP troopers arrived at the Hagerstown police department at 12:30 p.m.  (See id. at 51:17-52:6, 55:24-56:6).  At 1:00 p.m., Corporal Decker and Trooper Cox met with Dickerson in the break room.  (See id. at 56:7-9).  Trooper Cox read Dickerson his Miranda rights,

6

and Dickerson agreed to waive those rights and speak with PSP investigators.  (See id. at 52:18-53:12).  Dickerson provided a statement generally denying involvement in the triple homicide and offering an alibi for June 25, 2016.  (See Gov't Ex. 8 at 1-2).

Around the same time, PSP investigators interviewed the three women who were in the Equinox with Dickerson and Coles.  One of those women, Krista Rockwell, told investigators she had seen Coles with a black and silver handgun "numerous times" during the preceding week.  (See 9/3/21 Tr. 71:14-19).  She also told investigators she had been in the same Equinox with Dickerson and Coles several hours earlier, around midnight.  (See id. at 30:12-17, 74:1-19).  According to Rockwell, when a patrol officer stopped the Equinox as a "suspicious vehicle," Coles gave a false name and then fled on foot with a gun on him while the officer was running that name.  (See id. at 44:3-16, 73:3-10, 74:1-19; see also Gov't Ex. 5 at 5).  Rockwell reported the officer chased Coles for about two blocks and deployed a taser, but Coles escaped.  (See Gov't Ex. 5 at 5; see also 9/3/21 Tr. 28:20-29:13).  It is unclear what transpired afterward, only that the Equinox resurfaced later that morning with three of the same occupants.

Sergeant Duffey and Trooper Holderbaum thereafter applied to the Circuit Court of Washington County, Maryland, for a search warrant for the Equinox.  (See Gov't Ex. 5 at 1).  Their affidavit of probable cause detailed the triple homicide investigation to date, including the fraught relationship between Coles and Chaney, and described the events of the day: that officers had located Coles outside of a Days Inn in Hagerstown to arrest him on an outstanding New York state warrant;

that Coles exited the hotel carrying a white bag; that he got into the Equinox; that officers stopped the Equinox to take Coles into custody; and that the white bag was not on Coles' person during a search incident to arrest. (See id. at 5). Sergeant Duffey and Trooper Holderbaum also included the information provided by Rockwell. (See id.) Judge Kenneth Long approved the application and issued a search warrant for the Equinox at 3:45 p.m., authorizing law enforcement to search for various types of evidence pertaining to first-degree murder under Maryland law. (See id. at 7-9). Officers executed the search warrant at 4:05 p.m., (see 9/3/21 Tr. 16:19-20), and recovered, *inter alia*, multiple cell phones, a tablet, men's clothing, and two smaller plastic bags containing suspected heroin, (see Gov't Ex. 5 at 10; Gov't Ex. 6 at 3-4).

Law enforcement field tested the bagged substances, which tested positive for the presence of heroin and fentanyl; one bag weighed 16.1 grams and the other weighed 3.6 grams. (See Gov't Ex. 6 at 4). Sergeant Duffey contacted Agent Ron Isaacs ("Agent Isaacs"), a narcotics officer assigned to the Drug Task Force, given the quantity of drugs involved. (See 9/3/21 Tr. 18:1-18, 39:14-40:21). Agent Isaacs met with Dickerson and advised him of his Miranda rights. (See id. at 41:2-22). This time, Dickerson invoked his rights and refused to answer any questions, so Agent Isaacs ended the meeting except to ask if Dickerson wanted to identify which cell phone belonged to him. (See id. at 41:23-42:6).

## C.    Procedural History

The instant prosecution commenced with the filing of an indictment against Dickerson and Coles charging various drug-trafficking offenses in August

2016. This case is now proceeding on a third superseding indictment, which

charges Dickerson as follows:

- Count One: conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) and <u>Pinkerton v. United States</u>, 328 U.S. 640 (1946);

- Count Two: Hobbs Act robbery, and aiding and abetting same, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2;

- Counts Three, Four, and Five: using, brandishing, and discharging a firearm during and in relation to a crime of violence (Hobbs Act robbery and killing a witness) resulting in the deaths of Phillip Jackson, Brandon Cole, and Wendy Chaney, respectively, and aiding and abetting same, in violation of 18 U.S.C. § 924(c) and (j) and 18 U.S.C. § 2;

- Count Six: conspiracy to use, brandish, and discharge a firearm during and in relation to a crime of violence (Hobbs Act robbery and killing a witness) resulting in the death of Chaney, in violation of 18 U.S.C. § 924(c), (j), and (o);

- Count Seven: conspiracy to commit murder for hire in violation of 18 U.S.C. § 1958 and <u>Pinkerton</u>;

- Counts Eight, Nine, and Ten: murder of witnesses (Chaney, Jackson, and Cole, respectively), and aiding and abetting same, in violation of 18 U.S.C. § 1512(a)(1)(C) and 18 U.S.C. § 2;

- Count Eleven: conspiracy to murder witnesses (Chaney, Jackson, and Cole) in violation of 18 U.S.C. § 1512(k);

- Count Fourteen: conspiracy to distribute and possess with intent to distribute at least 100 grams of heroin and at least 28 grams of cocaine base and cocaine hydrochloride in violation of 21 U.S.C. § 846;

- Count Sixteen: possession with intent to distribute heroin, cocaine hydrochloride, and cocaine base, and aiding and abetting same, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2;

- Count Seventeen: possession with intent to distribute heroin and cocaine base, and aiding and abetting same, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2;

- Count Eighteen: distribution of heroin resulting in serious bodily injury, and aiding and abetting same, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2; and

- Count Nineteen: possession of firearms in furtherance of a drug-trafficking crime, and aiding and abetting same, in violation of 18 U.S.C. § 924(c)(1), 18 U.S.C. § 2, and <u>Pinkerton</u>.

(<u>See</u> Doc. 499 at 8-24, 28-31, 33-36).

Dickerson filed the instant suppression motion on March 17, 2020.  At that time, the government had not yet determined whether it would pursue the death penalty, so we held Dickerson's motion in abeyance pending that determination. The government filed its notice of election not to seek the death penalty on June 4, 2020, and we thereafter established a pretrial and trial schedule, including separate phases of pretrial motions practice.  The court convened an evidentiary hearing on the instant motion on September 3, 2021, and the parties have filed supplemental briefs.  Dickerson's motion is thus ripe for disposition.

## II.   <u>Discussion</u>

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures.  <u>See</u> U.S. Const. amend. IV; <u>see also</u> <u>Horton v. California</u>, 496 U.S. 128, 133 (1990).  Dickerson contends that law enforcement twice violated the Fourth Amendment on July 7, 2016: *first*, when they detained him and took him into custody for questioning without probable cause or reasonable suspicion; and *second*, when they seized and later searched the vehicle he was driving without a lawful basis.  We address these arguments *seriatim*.

## A.      Detention of Dickerson

The parties initially dispute whether law enforcement's seizure of Dickerson was an investigative detention or a *de facto* arrest.  The two scenarios receive different Fourth Amendment protections.  A law enforcement officer may conduct a brief, investigative seizure (*i.e.*, a <u>Terry</u> stop) if they have "reasonable, articulable suspicion that criminal activity is afoot."  See <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123 (2000) (quoting <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968)).  However, if an encounter "exceeds the bounds of an investigative stop," <u>see</u> <u>Florida v. Royer</u>, 460 U.S. 491, 506 (1983), the more extensive intrusion is deemed a *de facto* arrest and must be supported by probable cause, <u>see</u> <u>United States v. Sharpe</u>, 470 U.S. 675, 685 (1985).

We have previously observed that "the line between a <u>Terry</u> stop and an improper *de facto* arrest is often difficult to pinpoint."  <u>United States v. Fraguela-Casanova</u>, 858 F. Supp. 2d 432, 443 (M.D. Pa. 2012) (Conner, J.); <u>see</u> <u>Royer</u>, 460 U.S. at 506 (no "litmus-paper test for . . . determining when a seizure exceeds the bounds of an investigative stop").  The length of the encounter, while not dispositive, is "an important factor."  See <u>Sharpe</u>, 470 U.S. at 685.  We must also consider whether law enforcement "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."  <u>See</u> <u>id.</u> at 686 (citing <u>Michigan v. Summers</u>, 452 U.S. 692, 701 (1981)); <u>see also</u> <u>United States v. Torres</u>, 961 F.3d 618, 622 (3d Cir. 2020) (quoting <u>Sharpe</u>, 470 U.S. at 685).  It is the government's burden to show the challenged seizure "was

sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." See Royer, 460 U.S. at 500.

There is no dispute that officers' initial stop of the Equinox and their temporary seizure of its passengers did not violate the Fourth Amendment. (See Doc. 553 at 2 & n.2; Doc. 984 at 15). We have twice held that the arrest warrant for Coles was valid and supplied a lawful basis for law enforcement to stop the vehicle and arrest Coles. See United States v. Coles, ___ F. Supp. 3d ___, 2021 WL 3290668, at *3-5 (M.D. Pa. Aug. 2, 2021); United States v. Coles, 264 F. Supp. 3d 667, 675-76 (M.D. Pa. 2017). Officers were likewise justified in ordering Dickerson and the other three passengers to exit the vehicle as a safety precaution while effectuating Coles' arrest. See Brendlin v. California, 551 U.S. 249, 258 (2007) (citing Maryland v. Wilson, 519 U.S. 408, 414-15 (1997)). The question sub judice is whether officers' next steps—handcuffing Dickerson and transporting him to the police station for questioning—constituted a de facto arrest for which the government must establish probable cause.

Whether a defendant's involuntary transport to a police station for questioning exceeds the outer boundaries of an investigative Terry stop "depend[s] on the facts." See United States v. Wrensford, 866 F.3d 76, 85 (3d Cir. 2017). Our court of appeals has insisted "[n]ot every transportation by police . . . constitutes an arrest." See id. (citing United States v. McCargo, 464 F.3d 192, 197-99 (2d Cir. 2006)). As a practical matter, however, it is the rare case in which transporting a suspect in a police vehicle to a custodial setting for interrogation will not amount to a de facto arrest. Cf. id. at 85-87 (citing, inter alia, Hayes v. Florida, 470 U.S. 811, 816

12

(1985) (transport from home to police station for fingerprinting constituted *de facto* arrest); Royer, 460 U.S. at 494-95 (same for defendant escorted from concourse to airport interrogation room); Dunaway v. New York, 442 U.S. 200, 207 (1970) (same for defendant transported from neighbor's home to police station for questioning); Davis v. Mississippi, 394 U.S. 721, 724-28 (1969) (same for defendant transported to police station for fingerprinting and brief questioning)).

The facts of this case fit squarely within this long line of precedent. The undisputed record evidence establishes that, on July 7, 2016, police stopped the vehicle in which Coles, Dickerson, and others were riding; approached the vehicle with guns drawn; and ordered all passengers—Coles first, then Dickerson and the others—to exit. Officers then transported Dickerson to the Hagerstown police station in a marked police vehicle, likely in handcuffs, and held him there "at least for forty minutes" while waiting for PSP investigators to arrive to question him. (See 9/3/21 Tr. 28:10-14). It is unclear from the record if Dickerson was handcuffed while he waited or during the interview.[4] What is clear, however, is that Dickerson was not free to leave, nor was he told he was free to leave, at any point after the vehicle stop. (See 9/3/21 Tr. 27:1-3); see also Dunaway, 442 U.S. at 211.

---

[4] The government claims that Dickerson was not handcuffed in the break room, weighing against a finding of a *de facto* arrest. (See Doc. 985 at 21). The testimony was that Dickerson was not "handcuffed *to the floor* or shackled *to the floor*." (See 9/3/21 Tr. 13:10-11 (emphasis added); see also id. at 52:14-17). None of the officers could testify with certainty whether Dickerson's wrists were handcuffed during the interview. (See 9/3/21 Tr. 52:14-17 ("I don't believe he was. I can't say a hundred percent though. I know he wasn't to the floor. I'm not sure if he had handcuffs on his wrists."); id. at 27:10-11 ("I don't believe that he was handcuffed while sitting in the lunchroom.")).

Perhaps most importantly, Dickerson's detention was never intended to serve the purpose of an investigative Terry stop: officers did not detain Dickerson temporarily so they could pursue other means of investigation to "confirm or dispel their suspicions" about him. Cf. Sharpe, 470 U.S. at 685. There was no attempt by law enforcement to interview Dickerson briefly where he was found. See Dunaway, 442 U.S. at 212. Per contra, Dickerson's prolonged detention resembled an arrest from the start: Corporal Decker instructed Sergeant Duffey to take Dickerson and the other passengers to the Hagerstown police station because Corporal Decker wanted to interview all of them, and that was that. Once Corporal Decker gave his order, Dickerson was detained and would remain detained until PSP investigators arrived in Hagerstown.

We find that officers effected a de facto arrest of Dickerson when they handcuffed him, involuntarily transported him to the Hagerstown police station, and detained him there until PSP investigators arrived to interrogate him about the triple homicide. Accordingly, any statements Dickerson made during the ensuing interrogation are inadmissible at trial unless the government can establish the officers had probable cause to arrest him, or that some exception to the Fourth Amendment's requirements applies, "such as the independent source, inevitable discovery, or attenuation doctrines, or the good faith exception." See Wrensford, 866 F.3d at 88. Upon review of the record, we conclude that the government has adduced sufficient evidence to meet this secondary burden.

Officers can conduct a warrantless arrest in a public place if they have probable cause to believe the arrestee committed a felony. See Torres, 961 F.3d at

622 (citing United States v. McGlory, 968 F.2d 309, 342 (3d Cir. 1992)). The Supreme Court of the United States views probable cause as an amorphous concept, "not readily, or even usefully, reduced to a neat set of legal rules." See Ornelas v. United States, 517 U.S. 690, 695-96 (1996) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)). Whether probable cause exists is an objective determination based on the totality of the circumstances present at the time of the challenged governmental conduct. See United States v. Williams, 413 F.3d 347, 353 n.6 (3d Cir. 2005). Probable cause "is not a high bar." Kaley v. United States, 571 U.S. 320, 338 (2014).

The existence of probable cause must be determined from the view of the officer on the street, not the judge in the courtroom. See United States v. Sokolow, 490 U.S. 1, 7-8 (1989); United States v. Cortez, 449 U.S. 411, 418 (1981). As a general rule, whether probable cause exists "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." See Devenpeck v. Alford, 543 U.S. 146, 152 (2004) (citing Maryland v. Pringle, 540 U.S. 366, 371 (2003)). In the case of joint law enforcement endeavors, however, courts employ the "collective knowledge" doctrine to assess probable cause, under which the knowledge of all law enforcement officers involved in the arrest is imputed to the officer who conducted it. See United States v. Whitfield, 634 F.3d 741, 745-46 (3d Cir. 2010); United States v. Belle, 593 F.2d 487, 497 n.15 (3d Cir. 1979).

The collective knowledge of Sergeant Duffey (who conducted Dickerson's *de facto* arrest) and Corporal Decker (who ordered it) establishes probable cause

to believe Dickerson had committed a felony offense.[5]  Corporal Decker testified at

length to the factual basis for his directive that Sergeant Duffey detain Dickerson,

explaining that law enforcement had developed evidence that Dickerson and Coles

were involved in drug trafficking and possession of firearms and were persons of

interest in the murder investigation.  (See 9/3/21 Tr. 58:22-59:20).  He explained that

he knew Chaney had been cooperating with the Drug Task Force at the time of her

death regarding Dickerson's and Coles' drug-trafficking activities, and he described

text messages Chaney sent to Drug Task Force agents confirming that Dickerson

and Coles were supplying drugs to Jackson.  (See id. at 60:17-62:11).  In those text

messages, Chaney also expressed fear she had been "compromised by" Dickerson

and Coles as an informant.  (See id. at 62:11-15).

---

[5] Dickerson suggests the collective knowledge doctrine does not apply because there is no indication Corporal Decker shared any of this information with Sergeant Duffey.  (See Doc. 986 at 5-6).  This argument misapprehends how the doctrine operates.  Under the collective knowledge doctrine, "the knowledge of one law enforcement officer is *imputed to* the officer who actually conducted the . . . arrest."  See Whitfield, 634 F.3d at 745 (emphasis added).  There is no requirement that the officer possessing probable cause actually share the basis for that probable cause with other officers before ordering an arrest.  See id. at 746 (observing that "it would be impractical to expect an officer in such a situation to communicate to the other officers every fact that could be pertinent" in a later Fourth Amendment analysis); see also United States v.  Burton, 288 F.3d 91, 99 (3d Cir. 2002) (holding that "arresting officer need not possess an encyclopedic knowledge of the facts supporting probable cause, but can instead rely on an instruction to arrest delivered by other officers possessing probable cause").  We also reject Dickerson's claim that "this case was purely a Pennsylvania investigation," barring application of the collective knowledge doctrine to the Maryland officers who actually arrested Coles.  (See Doc. 986 at 5-6 n.2).  It is clear that, while PSP investigators took the lead on the triple homicide investigation, they worked closely with Maryland authorities from the start.  (See 9/3/21 Tr. 60:11-61:5).

Corporal Decker testified to additional corroborative evidence as well.  He explained that Jackson's widow confirmed to law enforcement that Jackson had been a drug user and that he knew Dickerson and Coles: according to Corporal Decker, Jackson's widow saw the three men shooting firearms together at Jackson's farm—the scene of the triple homicide—just two weeks before the murders.[6]  (See id. at 63:13-24).  She also indicated Dickerson and Coles arrived in "a silver Chevy" she thought was a Traverse.  (See id. at 63:22-23).  Finally, Corporal Decker testified that a third individual, identified only as a "source," reported having seen both Dickerson and Coles at the farm "on numerous occasions . . . supplying Phil Jackson with heroin."  (See id. at 62:25-63:9).

This information provided probable cause for law enforcement to arrest Dickerson on, at minimum, drug-trafficking charges.  And none of Dickerson's challenges to the government's evidence persuade us otherwise.  Dickerson claims, first, that Corporal Decker failed to establish the reliability of his unnamed source.  (See Doc. 986 at 10).  But even if we disregard that source's information—which is entirely consistent with information from named sources—the record still contains ample evidence from Chaney's text messages and Jackson's widow establishing that Dickerson and Coles knew and sold drugs to Jackson.  We also reject Dickerson's claim that the information from Chaney's text messages was too stale to supply

_____

[6] The government suggests in its briefing that this information establishes probable cause to arrest Dickerson because he and Coles "were prohibited by law from possession of firearms due to their prior criminal history."  (See Doc. 985 at 15).  The government did not elicit testimony during the evidentiary hearing that Corporal Decker or Sergeant Duffey knew Dickerson to be a convicted felon.  Thus, we cannot find either officer had probable cause to arrest Dickerson on this basis.

probable cause because the information was undated.  (See id. at 8-9).  Although
Corporal Decker did not date the information Chaney provided, the context of his
testimony, including a consistent use of present perfect tense, makes clear Chaney
had been cooperating until the time of her death and that her information about
Dickerson's and Coles' drug-trafficking activities was current through that time.
(See, e.g., 9/3/21 Tr. 60:17-19 (noting Drug Task Force agents described Chaney, on
night after murders, "as working with the task force at that point"); id. at 60:20-24
(discussing "text messages [Chaney] was providing to their agent in which she . . .
identifies Phillip Jackson, Shy, and K as supplying, being drug suppliers in that
area of Hagerstown and that they were supplying Phillip Jackson with heroin")).
Dickerson's de facto arrest occurred just 12 days after Chaney's death.  Jackson's
widow also confirmed the relationship between Dickerson, Coles, and Jackson was
current: her statement put the three men together at Jackson's farm just two weeks
prior to the triple homicide.  (See id. at 63:16-24).

    Finally, Dickerson suggests the government's probable-cause argument is
pretextual and should not be countenanced because officers never claimed to have
arrested Dickerson on probable cause until the suppression hearing.  (See Doc. 986
at 5-6).  He argues, in essence, the government's newly minted claim of probable
cause to arrest him for drug trafficking is an impermissible post hoc justification for
otherwise unlawful conduct.  (See id.)  The law is clear, however, that an officer's
subjective motivations—including whether they actually believed they had probable
cause to arrest—are of no moment in our probable cause analysis.  See Royer, 460
U.S. at 507 (citing Peters v. New York, decided with Sibron v. New York, 392 U.S.

40, 66-67 (1968)); <u>United States v. Hawkins</u>, 811 F.2d 210, 214 (3d Cir. 1987) (citing <u>Peters</u>, 392 U.S. at 66-67); <u>see also</u> <u>Belle</u>, 593 F.2d at 496-97.  In other words, as long as the government establishes an objectively valid basis for an arrest, the arresting officer's pretextual motives are irrelevant.  <u>See</u> <u>Hawkins</u>, 811 F.2d at 215.

Officers objectively had probable cause to arrest Dickerson for drug trafficking.  At the time of Dickerson's *de facto* arrest, Corporal Decker had sufficient information from multiple sources to believe Dickerson was committing felony offenses of drug trafficking, and, under the collective knowledge doctrine, that knowledge was imputed to Sergeant Duffey as the arresting officer.  We will therefore deny Dickerson's motion to suppress statements made during the custodial interview that followed his arrest.

**B.     Seizure and Search of Vehicle**

Dickerson appears to concede that a lawful arrest would permit the seizure and search of the vehicle.  (<u>See</u> Doc. 984 at 16).  Having determined that Dickerson's *de facto* arrest was supported by probable cause, we have little difficulty finding

that officers' seizure of the Equinox while they applied for a search warrant was also appropriate.[7]

We have already concluded the search warrant for the Equinox, obtained after Coles, Dickerson, and the others were detained and the vehicle was taken to the Hagerstown police station, was supported by probable cause.  See Coles, 264 F. Supp. 3d at 676-77.  We noted the affidavit of probable cause averred that Coles was a fugitive with an active bench warrant; that he was observed getting into the Equinox with a large white bag that was not found on his person during a search incident to arrest; and that Rockwell, another passenger in the Equinox, knew Coles to carry a firearm and had been in the same vehicle when it was stopped by police around 12:30 a.m. the night before, and that Coles had fled during that stop.

---

[7] We decline to address the government's argument, raised for the first time in posthearing briefing, that Dickerson failed to establish a reasonable expectation of privacy in the Equinox.  Fourth Amendment analysis traditionally begins with examining whether the defendant possessed a reasonable expectation of privacy in the object or place being searched.  See Kyllo v. United States, 533 U.S. 27, 27-28 (2001); Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).  In his motion, Dickerson alleged that the Equinox was registered to his friend, Shirley Griffith; that Griffith "routinely permitted" him to use her vehicle; and that she had granted him permission to use the vehicle on July 7, 2016.  (See Doc. 552 at 4).  The government did not deny this assertion in its prehearing briefing, nor did it dispute the issue at the hearing.  The government identified a potential standing challenge for the first time in a footnote in its posthearing briefing, stating that "Dickerson's expectation of privacy in the vehicle is unsupported" because he did not adduce evidence to substantiate his initial allegations during the hearing.  (See Doc. 985 at 10 n.5).  Unlike Article III standing, however, Fourth Amendment "standing" can be waived, see Rakas v. Illinois, 439 U.S. 128, 140 (1978); United States v. Stearn, 597 F.3d 540, 551-52 (3d Cir. 2010), and we conclude that the government waived any standing challenge by waiting until the eleventh hour to cursorily raise the issue, see Prometheus Radio Project v. FCC, 824 F.3d 33, 53 (3d Cir. 2016) (citing United States v. Pellulo, 399 F.3d 197, 222 (3d Cir. 2005); John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1076 n.6 (3d Cir. 1997)) (issue "doubly . . . waived" when "raised for the first time in a reply brief[] and . . . relegated to a footnote")).

See id.  Dickerson does not ask us to revisit whether these facts supplied probable cause at the time officers applied for the warrant.  Instead, he contends that law enforcement did not become aware of Rockwell's information until they returned to the police station—hours after the vehicle was initially seized—thus rendering the initial seizure of the vehicle unlawful.  (See Doc. 984 at 13-14).

When officers have probable cause to believe a vehicle contains contraband or evidence of a crime, they may either conduct a warrantless search of the vehicle on the street or impound the vehicle while they obtain a search warrant.  See Chambers v. Maroney, 399 U.S. 42, 51-52 (1970); Michigan v. Thomas, 458 U.S. 259, 261 (1982).  Consequently, there is no inherent problem with the officers' decision to tow the Equinox to another location to await a search warrant.  Dickerson instead implies that, once officers made their decision, they could not use any information obtained post-impoundment in their later search warrant application.  (See Doc. 984 at 13-14).  Dickerson cites no decisional law to support this line-drawing.  But even if he had, we would nonetheless reject the argument, because it rests on an incorrect assumption: that officers would have lacked probable cause to search the Equinox but for Rockwell's later-supplied information.

Under the "automobile exception" to the warrant requirement, law enforcement may conduct a warrantless search of a vehicle if there is "probable cause to believe that the vehicle contains evidence of a crime."  See United States v. Donahue, 764 F.3d 293, 299-300 (3d Cir. 2014) (citations omitted).  Probable cause to search, similar to probable cause to arrest, exists if there is a "fair probability" that evidence of a crime or contraband will be found in a vehicle.  See id. (quoting

<u>Gates</u>, 462 U.S. at 238).  When an officer obtains probable cause to search a legally stopped vehicle, the probable cause "justifies the search of every part of the vehicle and its contents that may conceal the object of the search."  <u>United States v. Ross</u>, 456 U.S. 798, 825 (1982).

Law enforcement had ample probable cause to search the Equinox at the time they seized it.  Even if we set aside the after-acquired information from Rockwell *and* the challenged information from the unnamed source, officers still knew the following when they seized the Equinox on July 7, 2016: (1) Dickerson and Coles knew two of the triple homicide victims, Jackson and Chaney, and sold drugs to Jackson; (2) Dickerson and Coles were familiar with Jackson's farm, the scene of the triple homicide, and had been seen there by Jackson's widow shooting firearms with Jackson, after arriving in a silver Chevrolet vehicle, just two weeks before the triple homicide; (3) Chaney had been in a relationship with Coles, who was known to be abusive and violent toward her; (4) Chaney had been cooperating against Dickerson and Coles at the time of her death; (5) Chaney had warned Drug Task Force agents that she believed Dickerson and Coles had discovered she was an informant; and (6) Chaney had suspected it was Coles who "recently . . . kicked [her] apartment door in looking for her."  (<u>See</u> 9/3/21 Tr. 58:20-65:11).  Officers also knew Coles had just exited a hotel lobby with a large plastic trash bag full of items and entered a silver Chevrolet Equinox, a vehicle similar to the one Jackson's widow described seeing Dickerson and Coles in at the farm; that Dickerson was driving the Equinox; and that the white trash bag was not found on Coles' person during a search incident to arrest.  (<u>See</u> <u>id.</u> at 9:21-10:23, 21:15-23:1; <u>see also</u> Gov't Ex. 5 at 5).

22

The information known to law enforcement at the time they seized the Equinox connected the vehicle, its driver (Dickerson), and its passenger (Coles) to the scene of the triple homicide and linked Dickerson and Coles directly to two of three triple homicide victims (Jackson and Chaney).  The information established both men were engaged in criminal activity—at minimum, the unlawful sale of drugs to Jackson—and further established both men had motive to kill Chaney because she was cooperating with police about those activities.  These facts supply the requisite "fair probability" that evidence of drug trafficking, firearms offenses, and murder may be found in the Equinox.  See Donahue, 764 F.3d at 299-300 (quoting Gates, 462 U.S. at 238); see also United States v. Coles, No. 1:16-CR-212, ___ F. Supp. 3d ___, 2021 WL 3290668, at *8 (M.D. Pa. Aug. 2, 2021) (holding similar facts supplied probable cause to obtain Coles' real-time cell-site location information).  Accordingly, we will deny Dickerson's motion to suppress evidence obtained during the search of the Equinox.

## III.   Conclusion

We will deny Dickerson's motion (Doc. 552) to suppress physical evidence and statements.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    October 29, 2021